970 So.2d 605 (2007)
PHOENIX ASSOCIATES LAND SYNDICATE, INC.
v.
E.H. MITCHELL & CO., L.L.C. and Steven M. Furr.
No. 2007 CA 0108.
Court of Appeal of Louisiana, First Circuit.
September 14, 2007.
Rehearing Denied November 7, 2007.
Thomas E. Schafer, III, George Denegre, Jr, Shannon S. Holtzman, Kelly B. Becker, New Orleans, August J. Hand, Covington, for Plaintiff-Appellant. Phoenix Associates Land Syndicate, Inc.
Reginald J. Laurent, Slidell, for Defendants-Appellees E.H. Mitchell & Co., L.L.C. and Steven M. Furr.
Before: CARTER, C.J., PETTIGREW, and WELCH, JJ.
PETTIGREW, J.
This appeal challenges a partial summary judgment rendered by the trial court on September 15, 2006. In granting partial summary judgment, the trial court *607 ruled in favor of defendant, E.H. Mitchell & Co., L.L.C., and against plaintiff, Phoenix Associates Land Syndicate, Inc. ("Phoenix"), declaring that the operating agreements between Phoenix and Pontchartrain Materials Corp., L.L.C. ("Pontchartrain") and Michael Ellinger ("Ellinger") were subleases. The trial court further declared that in executing these subleases, Phoenix had breached the provisions of a sand and gravel lease that had been assigned to it by L. Murphy's Trucking Service, Inc. ("Murphy's Trucking") as well as the Addendum to an Extension of Lease that Phoenix had entered into with E.H. Mitchell & Co., L.L.C. Accordingly, the trial court ruled that E.H. Mitchell & Co., L.L.C. was entitled to dissolution of the subject leases. From the judgment, Phoenix has appealed, and for the reasons that follow, we affirm the trial court's judgment of September 15, 2006.

FACTS AND PROCEDURAL HISTORY
The record reveals that Elbert H. Mitchell, the grandfather of defendants, Steven M. Furr, Brian Furr, and Michael Furr, owned approximately 820 acres of land with sand and gravel deposits situated along the Pearl River in St. Tammany Parish. Upon Elbert Mitchell's death, his grandsons became the owners of the land in question. The Furr brothers formed E.H. Mitchell & Co., L.L.C. ("Mitchell"), and Steven Furr ("Furr") became its president. Mitchell thereafter entered into a lease with Murphy's Trucking on August 8, 1996, regarding the mining of the sand and gravel on a portion of the property.[1] Said lease contained, in pertinent part, the following paragraphs:
6.
It is agreed that during the term of this lease there will be no mining, excavation, and removal of sand and gravel from the hereinbefore-described property other than those permitted under the terms and provisions of this lease.
. . . .
10.
This lease may not be sub-let, in whole or in part, without the written permission of Lessor.
On May 14, 1997 and August 28, 1997, Mitchell and Furr gave written consent to Murphy's Trucking and Murphy Construction Company, Inc. ("Murphy Construction") to assign or sub-lease to Phoenix upon such terms and conditions as Murphy's Trucking and Murphy Construction shall deem fit and proper. Said authority was "granted with the full understanding that the terms of the original lease shall not be changed and shall remain intact and that any sub-lease or assignment of this said lease shall be made subject to all the terms and conditions of the original lease dated August 8, 1996." Phoenix purchased Murphy Construction's entire sand and gravel operation through an act of assignment dated August 29, 1997.
On June 23, 1998, Mitchell and Phoenix entered into an addendum to and extension of the original sand and gravel lease between Mitchell and Murphy's Trucking dated August 8, 1996. This lease was subsequently assigned to Murphy Construction, which in turn assigned the lease to Phoenix on August 29, 1997. The June 23, 1998 addendum and extension of lease, contained several key provisions. First, paragraph one, provided:

*608 1.
All the provisions of the original sand and gravel lease between E.H. MITCHELL & COMPANY, L.L.C. and L. MURPHY'S TRUCKING SERVICE, INC., and assigned to PHOENIX ASSOCIATES LAND SYNDICATE, shall remain in full force and effect except as modified herein.
The addendum and extension of lease also provided for a change of the beginning of the primary term and extensions thereof and other conditions, to read as follows:
4.
Lessor grants unto Lessee, from the date of execution hereof and in lieu and substitution of the chronological terms contained in the original lease a renewal of the sand and gravel lease beginning as of this date an initial term of five (5) years. Lessee shall have the option to renew the sand and gravel lease after said initial five (5) years period for additional five (5) year terms, but in no event shall the Sand and Gravel Lease be extended in excess of twenty-five (25) years from this date; i.e., there shall be no more than four (4) extensions of the initial five (5) year term.
The addendum and extension of lease also dealt with potential changes of royalties to be paid as follows:
5.
The provisions concerning royalties in the sand and gravel lease are hereby modified as follows: The royalties paid for waste concrete sand, concrete sand, mason sand, washed gravel, road gravel, pea gravel and waste pea gravel shall remain the same. The issue of royalties shall be addressed every five (5) years and shall be increased in proportion to the market price of the materials, should the price thereof increase. It is the intent of the parties that E.H. MITCHELL & COMPANY, L.L.C., shall receive the same percentage in royalties for the aforementioned materials should the market price increase. [Emphasis supplied]
Phoenix later ran into financial difficulties and filed for bankruptcy reorganization on November 18, 1999. The bankruptcy court rejected Phoenix's plan of organization and dismissed the bankruptcy on January 22, 2001. Problems developed between Phoenix and Mitchell regarding Phoenix's operations, including, but not limited to, the alleged lack of payment of royalties, underpayment of royalties, the alleged taking of overburdened soil without remuneration to Mitchell, and the allowance of third parties on the premises to mine same without Mitchell's written permission.
Prior to the expiration of the primary term on June 23, 2003, Phoenix sent a letter to Mitchell, notifying Mitchell of Phoenix's desire to exercise its option to renew the lease on the property for another five years. The parties however could not come to an agreement as to the royalties owed pursuant to paragraph five (5) of the Addendum to and Extension of Lease executed on June 23, 1998. Phoenix nevertheless continued its operations on the leased premises without a written extension of said lease or an agreement with Mitchell as to the amount of royalties owed. Due to its inability to negotiate the price to be paid for a renewal lease, Phoenix sued Mitchell on June 17, 2003.
Subsequent to this, Phoenix entered into certain "Operating Agreements" with two other companies to mine part of Mitchell's property. The first of these "Operating Agreements" was dated August 15, 2004, and involved Phoenix and Pontchartrain, while the second agreement dated June 15, 2005 was entered into between Phoenix and Ellinger. Mitchell never consented *609 to these "Operating Agreements" either orally or in writing.
Phoenix filed the instant suit on June 17, 2003, naming Mitchell and Furr as defendants therein. Phoenix sought to recover damages for Mitchell and Furr's alleged breach of their obligations pursuant to the lease, as well their alleged tortious interference with Phoenix's operations on the property owned by Mitchell. On July 3, 2003, Mitchell filed an answer setting forth affirmative defenses together with a reconventional demand against Phoenix. Mitchell sought a cancellation of its lease with Phoenix, an accounting of materials removed by Phoenix from the premises, and damages for Mitchell's lost opportunities to lease the property to other prudent operators. On June 25, 2003, Furr responded by filing peremptory exceptions that raised objections of no cause of action and prescription with respect to Phoenix's claims against him.
On September 25, 2003, Phoenix filed a supplemental and amending petition wherein Phoenix clarified its factual allegations against Furr. Mitchell thereafter filed a supplemental and amended reconventional demand against Phoenix on August 10, 2005, wherein Phoenix clarified its factual allegations with respect to damages and sought a declaratory judgment that the operating agreements between Phoenix and various independent operators were unauthorized and prohibited subleases that were null and void. Mitchell also prayed for a judicial dissolution and cancellation of its lease with Phoenix. Mitchell further prayed for a preliminary injunction prohibiting Phoenix from removing products from the soil during the pendency of this litigation.
Mitchell filed a second supplemental and amending reconventional demand against Phoenix on October 27, 2005. Following a hearing on November 10, 2005, the trial court signed a judgment on December 15, 2005, denying Mitchell's request for a preliminary injunction. On July 26, 2006, Mitchell moved for a partial summary declaratory judgment seeking a declaration that the operating agreements between Phoenix and Pontchartrain, and Phoenix and Ellinger were subleases and constituted a breach of the mineral lease between Mitchell and Phoenix.
The trial court rendered judgment on September 15, 2006, declaring that Phoenix's operating agreements with Pontchartrain and Ellinger constituted subleases, which amounted to a material breach by Phoenix of its lease with Mitchell. The trial court further dissolved and cancelled the sand and gravel lease between Mitchell and Phoenix. Thereafter, on October 10, 2006, Phoenix filed for a suspensive appeal from the trial court's judgment of September 15, 2006, and it is that judgment that forms the basis of the instant appeal.
This court, ex proprio motu, issued a rule to show cause why the appeal should not be dismissed because the trial court's judgment of September 15, 2006, appeared to be a partial summary judgment, which pursuant to La.Code Civ. P. art. 1915(B), had not been designated as a final judgment by the trial court. The parties were given thirty days to show cause by briefs, why this appeal should not be dismissed based upon the failure by the trial court to designate the judgment as final pursuant to La.Code Civ. P. art. 1915(B). See Motorola, Inc. v. Associated Indemnity Corporation, XXXX-XXXX, pp. 16-17 (La.App. 1 Cir. 10/22/03), 867 So.2d 723, 732-733. By an order of this court dated April 19, 2007, the rule to show cause was recalled and this appeal was maintained.
ISSUES PRESENTED FOR REVIEW
In connection with its appeal in this matter, Phoenix has presented the following *610 issues for review and consideration by this court:
1. Whether the district court erred in concluding that the Operating Agreements were prohibited subleases, where the Operating Agreements were "internally inconsistent" in material respects by Mitchell's own admission, and therefore ambiguous, and where the evidence before the court was highly disputed.
2. Whether the district court improperly resolved material factual issues in dispute on summary judgment in terminating a sand and gravel lease where the lease did not provide for automatic termination in the event of a breach, Louisiana law requires consideration of numerous fact-intensive factors before a lease can be cancelled, and the proper resolution of those fact issues was hotly contested.
APPEALABILITY OF JUDGMENTS
There yet remains one last hurdle that hinders us in proceeding with our review of this matter, and that is whether the trial court properly designated the partial judgment as a final judgment pursuant to La.Code Civ. P. art.1915. The trial court's designation however is not determinative of this court's jurisdiction. Van ex rel. White v. Davis, XXXX-XXXX, p. 2 (La.App. 1 Cir. 2/16/01), 808 So.2d 478, 480. In order to assist this court in our review of designated final judgments, the trial court should give explicit reasons, either oral or written, for its determination that there is no just reason for delay. In those cases where a trial court did not provide explicit reasons, either oral or written, for its determination that no just reason for delay existed, the appellate court is required to conduct a de novo determination of whether the designation was proper. R.J. Messinger, Inc. v. Rosenblum, XXXX-XXXX, pp. 13-14 (La.3/2/05), 894 So.2d 1113, 1122. As an appellate court, we cannot determine the merits of such appeals unless our jurisdiction is properly invoked by valid final judgment. See La.Code Civ. P. art.2083.
Based on our de novo review of the designation utilizing the factors set forth in R.J. Messinger, Inc., XXXX-XXXX at 14, 894 So.2d at 1122-1123, we conclude that the designation is proper, and that the jurisdiction of this court has been properly invoked.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Johnson v. Evan Hall Sugar Coop., Inc., 2001-2956, p. 3 (La.App. 1 Cir. 12/30/02), 836 So.2d 484, 486. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B). Summary judgment is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La.Code Civ. P. art. 966(A)(2); Thomas v. Fina Oil and Chemical Co., XXXX-XXXX, pp. 4-5 (La. App. 1 Cir. 2/14/03), 845 So.2d 498, 501-502.
On a motion for summary judgment, the initial burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require that all essential elements of the adverse party's claim, action, or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse *611 party's claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La.Code Civ. P. art. 966(C)(2); Robles v. ExxonMobile, XXXX-XXXX, p. 4 (La.App. 1 Cir. 3/28/03), 844 So.2d 339, 341.
Summary judgments are reviewed on appeal de novo. An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Ernest v. Petroleum Service Corp., 2002-2482, p. 3 (La.App. 1 Cir. 11/19/03), 868 So.2d 96, 97, writ denied, XXXX-XXXX (La.2/20/04), 866 So.2d 830.
In Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, pp. 26-27 (La.7/5/94), 639 So.2d 730, 750-751, the Louisiana Supreme Court set forth the following parameters for determining whether an issue is genuine or a fact is material.
A "genuine issue" is a "triable issue." More precisely, "[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes." In determining whether an issue is "genuine," courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. "Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact."
A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. [Citations omitted.]
Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Foreman v. Danos and Curole Marine Contractors, Inc., 97-2038, p. 7 (La.App. 1 Cir. 9/25/98), 722 So.2d 1, 4, writ denied, 98-2703 (La.12/18/98), 734 So.2d 637. Thus, we now turn to a discussion of the applicable law.

DISCUSSION
In support of its motion for partial summary declaratory judgment, Mitchell introduced its memorandum together with the affidavit of its president, Furr, that referred to, and which by reference included, the following exhibits:

MSJ-1: being a copy of the Act of Sand and Gravel Lease, dated August 8, 1996, between Mitchell and Murphy;

MSJ-2(A) and MSJ-2(B): dated May 14, 1997 and August 28, 1997, respectively, being copies of the consent to sublease or assignment of lease, wherein Mitchell granted permission to Murphy to assign Mitchell's sand and gravel lease dated August 8, 1996, to Phoenix;

MSJ-3: being a copy of the assignment of lease, dated August 29, 1997, by which *612 Murphy assigned the sand and gravel lease to Phoenix;

MSJ-4: being the Addendum and Extension of Lease, dated June 23, 1998, in which Mitchell granted Phoenix an extension of the sand and gravel lease, which was assigned to Phoenix;

MSJ-5: being a copy of the Operating Agreement, dated August 16, 2004, between Phoenix and Pontchartrain;

MSJ-6: being a copy of the Operating Agreement, dated June 15, 2005, between Phoenix and Ellinger;

MSJ-7: being a copy of the Operating Agreement, dated December 22, 2005, between Ellinger and Dirt Connection; and

MSJ-8: being a copy of the Operating Agreement, dated February 10, 2006, entered between Ellinger, Ron Omelian, and Lake Shore Materials.
In opposition to the motion for partial summary declaratory judgment, Phoenix introduced their memorandum and the following supporting exhibits.

Exbt. A: being the affidavit of Paul Alonzo, President of Phoenix;

Exbt. B: being selected portions of the deposition of Ellinger, dated April 19, 2006;

Exbt. C: being a letter by Fletcher Cockran to John DesJardine, Jr., The Dirt Connection, Inc., dated January 20, 2006; and

Exbt. D: being a letter dated February 2, 2006, from Fletcher Cockran to Marty A. Burnstein.
In rebuttal, Mitchell offered a supplemental affidavit of Furr, dated September 14, 2006.
It is an undisputed fact in this litigation that Mitchell did not orally or in writing consent to the various "Operating Agreements" dated August 16, 2004, between Phoenix and Pontchartrain; dated June 15, 2005, between Phoenix and Ellinger; dated December 22, 2005, between Ellinger and The Dirt Connection; and dated February 10, 2006, between Ellinger, Ron Omelian, and Lakeshore Materials. Therefore, there is no material issue of fact in dispute concerning same.
There is no material issue of fact in dispute in that Phoenix is prohibited from subletting the property without the written permission of Mitchell, pursuant to paragraphs 6 and 10 of the Act of Sand and Gravel Lease, dated August 8, 1996, between Mitchell and Murphy; the Consent to Sublease or Assign Lease, by Mitchell to Murphy, by acts dated May 14, 1997, August 28, 1997; the Assignment of Lease, dated August 29, 1997, by Murphy to Phoenix; and the Addendum to and Extension of Lease, dated June 23, 1998, between Mitchell and Phoenix.
Pursuant to La.Code Civ. P. art. 1877, declaratory judgments "may be reviewed as other orders, judgments, and decrees." "Accordingly, the character of this action as one seeking declaratory judgment does not affect the standard of review of the summary judgment." Delahoussaye v. Board of Supervisors of Community & Technical Colleges, XXXX-XXXX, p. 4 (La. App. 1 Cir. 3/24/05), 906 So.2d 646, 649; Motorola Inc. v. Associated Indemnity Corporation, XXXX-XXXX, p. 5 (La.App. 1 Cir. 4/30/03), 867 So.2d 715, 717.
As between Mitchell and Phoenix, the prohibition against Phoenix subleasing the premises set forth in paragraphs 6 and 10 of the August 8, 1997 lease between Mitchell and Murphy; the assignment of that lease, dated August 29, 1997, by Murphy's Trucking to Phoenix; and the addendum to and extension of lease, dated June 23, 1998, between Mitchell and Phoenix, makes paragraphs 6 and 10 the law between Mitchell and Phoenix. The obligation *613 imposed upon Phoenix by paragraphs 6 and 10 of the Mitchell mineral lease is unequivocal and express.[2] "[T]he mineral lease constitutes the law between the parties and regulates their respective obligations." Terrebonne Parish School Board v. Castex Energy, Inc., XXXX-XXXX (La.1/19/05), 893 So.2d 789, (quoting Caskey v. Kelly Oil Company, 98-1193 p. 8 (La.6/29/99) 737 So.2d 1257, 1262); see Frey v. Amoco Production Co., 603 So.2d 166, 171 (La.1992).
The key issue in this appeal turns on whether the "Operating Agreements," executed by Phoenix with Ellinger, on June 15, 2005, and Pontchartrain, on August 15, 2004, are in fact subleases and a direct breach by Phoenix of its Mitchell lease and the addendum to and extension of said lease, dated June 23, 1998.
The covenant in the lease against subletting is for the benefit of the landlord, because it is regarded as for his interest to determine who shall be a tenant of his property. See Montecon v. Faures, 3 La. Ann. 43 (1848). If the operating agreements are truly subleases, then Phoenix, by executing these agreements with Pontchartrain and Ellinger without Mitchell's consent, has caused a "subletting-without-consent" breach of the Mitchell to Murphy lease, assignment of said lease by Murphy to Phoenix, and the addendum to and extension of the lease between Mitchell and Phoenix. See Major v. Hall, 251 So.2d 444, 449 (La.App. 1 Cir.1971), partially reversed on other grounds, 262 La. 243, 263 So.2d 22 (1972). This would cause Phoenix to be in active breach of paragraph 10 of the Mitchell to Murphy lease. The division of breaches into active and passive violations is preserved under La. R.S. 31:135 of the Louisiana Mineral Code. Violations of mineral leases may be either passive or active is established. Hunt v. Stacy, 25,578, p. 5 (La.App. 2 Cir. 2/23/94), 632 So.2d 872, 875, (citing comments to La. R.S. 31:135 of the Louisiana Mineral Code).
Phoenix takes the position that it was never its intention to enter into a sublease or to transfer any of its rights on the lease to Pontchartrain and Ellinger. Pontchartrain and Ellinger, according to Phoenix, were independent contractors engaged to perform certain specified services in the same way Phoenix contracted out other services, such as, trucking services. In support of this position, Phoenix referred to a particular paragraph in the recital portions of the "Operating Agreements" with both Pontchartrain and Ellinger that provide:
Whereas, Phoenix and Pontchartrain agree that this Operating Agreement is not and shall not be constructed as a lease or a sublease and that Phoenix does not surrender, transfer, or in any other matter assign to Pontchartrain its rights or obligations as Lessee under the aforesaid Sand and Gravel Lease, Consent to Sub-Lease or Assignment of Lease, and/or Addendum to and Extension of Lease.
Phoenix argues that the expression of intent by Pontchartrain and Ellinger not to consider their agreements as assignments or subleases legally binds the court and Mitchell in characterizing these contracts or at the minimum creates a material issue of fact to prevent summary judgment.
Whether the "Operating Agreements" between Phoenix, Pontchartrain, and Ellinger are really subleases is a question of law. Louisiana Supreme Court has *614 repudiated Phoenix's argument. "Questions of law cannot be confessed or admitted; the characterization of the contracts in issue is preeminently of that nature." Howard Trucking Co., Inc. v. Stassi, 485 So.2d 915, 918 (La.1986), cert. denied, 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986). The intent of Phoenix, Ellinger, and Pontchartrain cannot determine the character of the operating agreements because "the legal character of a contract must be determined by its substance, by its effect on the parties, what the lawnot the partiessays it is; so the parties' intent is not conclusive." Major, 251 So.2d at 448. "The intent of the parties to a contract should govern its interpretation . . ., the best evidence of the parties' intent is what the parties agreed to do." La. Civ.Code art.2045. (Citations omitted.) Howard Trucking Co., 485 So.2d at 918. The trial court is entitled to apply the law to the legal documents before it without being hindered by erroneous assumptions of law by the parties. Cities Service Oil & Gas Corp. v. State, 574 So.2d 455, 461 (La.App. 2 Cir.), writs denied, 578 So.2d 132, 133 (La.1991). The effects on Mitchell's rights control the character of the operating agreements. Although the parties entered into a written contract in which they were identified as independent contractors, and this designation may have some validity between the parties, it is not binding or controlling on the rights of third persons. The rights of third persons are controlled by the substance, rather than the title, of the contractual relationship between the parties. Hughes v. Goodreau, 2001-2107, pp. 11-12 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, 659, writ denied, XXXX-XXXX (La.4/21/03), 841 So.2d 793.
Under La. R.S. 31:4, the provisions of the Louisiana Mineral Code are applicable to all forms of minerals, including oil and gas. Said provisions also apply to rights to explore for, or mine, or remove from land the soil itself, gravel, shells, subterranean water and other substances. Provisions of the Mineral Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. La. R.S. 31:2. Individuals may renounce or modify what is established in their favor by the provisions of the Mineral Code unless they are expressly or impliedly prohibited, and the renunciation or modification does not affect the rights of others and is not contrary to the public good. La. R.S. 31:3.
Ownership of land includes all minerals occurring naturally in a solid state. Solid minerals are insusceptible of ownership apart from the land until reduced to possession. La. R.S. 31:5. Pursuant to La. R.S. 31:114, a mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals, and in accordance with La. R.S. 31:2, mineral leases are construed as leases generally, and whenever pertinent codal provisions applicable to ordinary leases are applied to mineral leases. See Frey, 603 So.2d at 171.
The codal requirements for a sublease are the same as for the lease, since a sublease is a lease between the original lessee and a third party. A lease is a contract by which one party gives to another the enjoyment of the thing for a fixed price. La. Civ. Code arts. 2669, 2674.[3] A lease, which may be oral (La. Civil Code art. 2683),[4] requires an object, a *615 certain and determinate price, and consent. La. Civ.Code arts. 2670, 2671.[5]Major, 251 So.2d at 447. The "Operating Agreements" between Phoenix, Pontchartrain, and Ellinger contain all three of these elements.
Phoenix contends the agreements with Pontchartrain and Ellinger were operating agreements. An "operating agreement" implies Pontchartain and Ellinger were operating the mine for Phoenix, and Phoenix was still the owner of the minerals produced. That is contrary to the very agreements between Phoenix, Pontchartrain, and Ellinger. Under both agreements, Pontchartrain and Ellinger became owners of the gravel, soil, and minerals produced. This fact is made clear in paragraph 16 of both the Pontchartrain and Ellinger agreements with Phoenix, which obligates Pontchartrain and Ellinger to sell their mined minerals, if any available, when Phoenix requests.
In paragraph 15 of the Mitchell lease to Phoenix, Mitchell granted Phoenix a singular right-of-way to reach the leased premises insofar as such right-of-way may be required. In paragraph 2 of the agreements between Phoenix, Pontchartrain, and Ellinger, Phoenix granted to Pontchartrain and Ellinger the right to use all existing roads on the subject property including the right to build additional roads.
In the original lease by Mitchell to Phoenix, Phoenix did not acquire the right to bring outside materials onto Mitchell's property for reprocessing. In paragraphs 1, 8, 16, and 23 of Pontchartrain's agreement, and paragraphs 8, 16, and 23 of Ellinger's agreement, Pontchartrain and Ellinger were given the right to bring outside materials onto the Mitchell's property for reprocessing. Further, Phoenix, in its agreements with Pontchartrain and Ellinger, granted to Pontchartrain and Ellinger the use of all existing electrical utilities on the subject propertya grant of authority that Phoenix did not possess.
Phoenix dismembered Mitchell's ownership by conferring upon Pontchartrain and Ellinger specified rights of use on the property. The operating agreements between Phoenix, Pontchartrain, and Ellinger provide that Pontchartrain and Ellinger shall have the sole and exclusive use of the area designated as Pontchartrain's and Ellinger's mining and dredging plan. These rights to sole and exclusive use of Mitchell's property were for the purpose of allowing Pontchartrain and Ellinger to dredge and/or mine various materials on and from the property, including access to the soils and minerals. They further gained the right to bring other scales and equipment on Mitchell's property.
A "personal servitude" is a charge on a thing for the benefit of a person. La. Civ.Code art. 534. Right of use is one of three types of personal servitudes recognized by the Civil Code. A right of use servitude confers on a favorable person a specified use of an estate less than full enjoyment. La. Civil Code art. 639. A "mineral lease" on the other hand, is a contract by which the lessee is granted the right to explore for mine, or remove minerals from the land; it is a real right with some characteristics in the nature of a limited personal servitude or right of use. La. R.S. 31:4. La. R.S. 31:16. The operating agreements imposed charges on Mitchell's land for the benefit of Pontchartrain and Ellinger. By executing the "Operating Agreements," Phoenix conferred to Pontchartrain and Ellinger the right to specified uses of Mitchell's land less than full enjoyment. This created a dismemberment *616 of the ownership of Mitchell's land, whether by lease or personal servitudes. Phoenix, pursuant to its mineral lease with Mitchell, possessed no authority to create real rights or personal servitudes on Mitchell's property in favor of third persons. A land owner may convey, reserve or lease his right to explore and develop his land for production of minerals and to reduce them to possession. La. R.S. 31:15. Basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease. La. R.S. 31:16. The executive right is the exclusive right to grant mineral leases of specified land or mineral rights. La. R.S. 31:105. Phoenix is neither the landowner nor owner of the executive right to create mineral leases or servitudes. The effects of dismemberment support the trial court's finding of a material breach. See Quinn Properties, Inc. v. Sabine River Realty, Inc., 95-1714 (La.App. 3 Cir. 5/29/96), 676 So.2d 639.
After a thorough de novo review of the record and all exhibits included herewith, we conclude that the assignment of error of appellant is without merit, and the trial court did not commit error in declaring that the operating agreements between Phoenix, Pontchartrain, and Ellinger to be in truth and in fact subleases. We further find the trial court did not commit error in declaring that the execution by Phoenix of these subleases with Pontchartrain and Ellinger constituted a breach of the Act of Sand and Gravel Lease assigned from Murphy to Phoenix and the Addendum and Extension of Lease between Mitchell and Phoenix, and further granting a dissolution of that Act of Sand and Gravel Lease assigned from Murphy to Phoenix and the Addendum to and Extension of Lease between Mitchell and Phoenix.
For the foregoing reasons, we do hereby affirm the judgment of the trial court rendered September 15, 2006. All court costs of this appeal shall be assessed against Phoenix.
AFFIRMED.
CARTER, J., concurs in the result.
NOTES
[1] Pursuant to a separate act of assignment also dated August 8, 1996, Murphy's Trucking assigned its sand and gravel lease from Mitchell to Murphy Construction Company, Inc.
[2] A lease providing for the exploring for, mining or removal from the land the soil itself or gravel and other substances is a mineral lease and is covered by the provisions of the Louisiana Mineral Code. See La. R.S. 31:4.
[3] Former La. Civ.Code arts. 2669 and 2674 in condensed form are now reproduced in La. Civ.Code art. 2668 by Act 2004, No. 821, sec. 1, eff. Jan. 1, 2005.
[4] Former La. Civ.Code art. 2683 in condensed form is now reproduced in La. Civ.Code art. 2681 by Act 2004, No. 821, eff. Jan. 1, 2005.
[5] Former La. Civ.Code arts. 2669 and 2671 in condensed form is now reproduced in La. Civ.Code arts. 2668 and 2678, respectively, by Act 2004, No. 821, sec. 1, eff. Jan. 1, 2005.